**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| HTP, INC., a Washington Corporation<br><br>**Plaintiffs,**<br><br>v.<br><br>FIRST MERIT GROUP HOLDINGS INC., a Canadian provincial corporation; NANOGEN TECHNOLOGIES GROUP, INC., a Canadian provincial corporation, BARRY LEE; ANTHONY DUTTON, and DAVID RICHARDSON<br><br>**Defendants.** | **No.** 2:21-cv-00732<br><br>COMPLAINT FOR BREACH OF FDICUIARY DUTY SEEKING TO DISREGARD CORPORATE ENTITY AND IMPOSE CONSTRUCTIVE TRUST |

Plaintiff sues Defendants and alleges as follows:

### I. PARTIES

1. Plaintiff HTP, Inc. is, and at all material times hereto was, a current and active Washington corporation ("HTP").

2. Defendant FIRST MERIT GROUP HOLDINGS INC., is, and at all material times hereto was, a Canadian corporation with a principal place of business in Vancouver, British Columbia, Canada ("FMG").

COMPLAINT– 1

3. Defendant BARRY LEE is, and at all material times hereto was, an individual and Canadian citizen ("Lee").  Lee is an owner of FMG.

4. Defendant ANTHONY DUTTON is, and at all material times hereto was, an individual and Canadian citizen ("Dutton").   Dutton is a senior manager at FMG.

5. Defendant DAVID RICHARDSON is, and at all material times hereto was, an individual and Florida citizen ("Richardson"). Richardson is a shareholder in HTP and a public relations professional working with FMG.

6. Defendant NANOGEN TECHNOLOGIES GROUP INC. is a Canadian corporation registered in British Columbia with its principal place of business in Vancouver, British Columbia ("NanoGen").  Based on information and belief, FMG, Dutton, Lee, and Richardson have direct or indirect ownership interests in and managing rights and responsibilities over NanoGen.

## II.   JURISDICTION AND VENUE

7. Jurisdiction is predicated on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a Washington citizen.  All Defendants are citizens of states other than Washington.

8. Venue is appropriate in this judicial district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  This action involves FMG, Dutton, Lee, Richardson, and NanoGen taking for themselves a business opportunity that HTP hired them in Washington to negotiate and procure for HTP, a Washington corporation.  FMG, Lee, Dutton, Richardson, and NanoGen had numerous communications and other contacts in this District in taking the business opportunity that HTP had hired them to procure for HTP's benefit.

### III. BACKGROUND FACTS

9. Since 2012 HTP has exploited diesel engine emission control technology by breaking down water into its component elements (Hydrogen and Oxygen) and creating hydrogen and oxygen on demand and then using those elements to catalyze internal combustion engines to increase fuel efficiency and decrease greenhouse gas emissions ("ICA Technology"). This was always seen as an interim move to HTP's goal of creating hydrogen on demand and directly generating power from pure hydrogen. HTP also developed energy storage technology using hydrogen and other technologies described in this Complaint.

10. Evan Johnson ("Johnson") became HTP's chief technology officer and director in November 2015.

11. While continuing to develop HTP's ICA Technology, Johnson (and others) developed a more efficient, energy saving, cost effective, and lighter method to electrolyze water into its component elements and created hydrogen and oxygen on demand by using a graphene membrane. Johnson (and others) applied for a patent on this graphene application for the ICA Technology, which patent application was assigned to HTP.

12. In June 2018, HTP joint ventured with S.B. Joseph Clark ("Clark") and his company JC Aviation Investments, LLC., a Washington limited liability company ("JCAI"). Together, HTP and JCAI formed and owned HyTech Power, LLC, a Washington limited liability company on June 14, 2018 ("HyTech"). HTP contributed its ICA Technology and other technologies to HyTech on June 14, 2018. JCAI contributed money, contacts, and know how, and owned a majority interest in HyTech and could appoint a majority of HyTech's directors.

COMPLAINT– 3

13. As part of this joint venture transaction, Johnson's employment with HTP was terminated on June 14, 2018, and Johnson commenced as HyTech's chief technology officer on that date.

14. Graphene is expensive to purchase, however. The challenge to scaling the graphene application was to develop a cost-effective method to produce graphene. HTP, and then HyTech continued to develop graphene production capabilities.

15. While developing a cost-effective method to produce graphene, Johnson, HTP and HyTech also began to investigate graphene applications that could be used in other industries.

16. In late 2019 HyTech was experiencing financial difficulties. Acamar Investments, Inc., an HTP shareholder that also had approximately $3 Million of debt secured by HyTech's interest in HyTech's assets, including the ICA Technology ("Acamar"), offered and promised Johnson that Acamar would fund Johnson's and two technician's salary and benefits through December 31, 2020 in exchange for Johnson and the technicians focusing their efforts on further testing and refinements to the ICA Technology and the ICA Units, and developing the other Technologies.

17. In late 2019, Johnson accepted Acamar's offer and promise and began testing the ICA Units with potential purchasers and continued to further develop the Technologies.

18. In early 2020 HTP and JCAI disagreed as to additional funding to continue advancing the Technologies and ICA Units. JCAI wanted to provide additional funding through a JCAI-affiliated entity Clark Energy, LLC and diluting HTP's interest in HyTech because of that additional funding. HTP resisted further dilution and wanted to acquire additional funding through another method.

19. While HTP and JCAI were squabbling over the additional funding issue, JCAI, which controlled HyTech's board of directors, pressured HTP to accept its proposed terms for

additional funding and tried to stop Johnson's effort to test the ICA Units with potential purchasers to procure ICA Unit sales by causing HyTech to terminate Johnson's employment in March 2020. Acamar, however, continued to honor the commitment it made to Johnson and continued to fund Johnson's and the two technicians' salary and benefits and Johnson continued to test the ICA Units for HyTech to procure ICA Unit sales from potential purchasers.

20. JCAI's sole member and manager S.B. Joseph Clark ("Clark") died suddenly and unexpectedly in late March 2020. After he died, HyTech reinstated Johnson as its CTO, but then terminated his employment again on April 17, 2020.

21. Also in April 2020, HTP, which wanted to monitor and value its interest in HyTech and to continue advancing the Technologies, hired FMG, Dutton, and Lee to value the Technologies in the market and solicit sufficient investments on HTP's behalf so HTP could buy JCAI's interest in HyTech now that Clark had died. Hereafter HTP's purchase of JCAI's interest in HyTech will be referred to as the "JCAI Deal" and the money it would have to pay JCAI will be referred to as the "JCAI Purchase Price."

22. While FMG, Dutton, and Lee were researching how to best raise the JCAI Purchase Price to fund the JCAI Deal, Acamar continued to fund Johnson's and the two technician's salaries and benefits pursuant to Acamar's prior commitment, and Johnson and the two technicians continued to test the ICA Units with potential ICA Unit purchasers and advance all the related technology.

23. Johnson's employment with HyTech ended on April 17, 2020.

24. Despite Johnson's employment with HyTech ending, Johnson continued to serve as an HTP director until late June 2020, when he resigned.

25. In May 2020, Johnson, on behalf of HyTech and HTP, beta yard tested HyTech's ICA Units with Nabors Industries, LTD., a New York Stock Exchange publicly

COMPLAINT– 5

WESTERN WASHINGTON LAW
GROUP, PLLC
PO BOX 468
SNOHOMISH, WA 98291
425.728.7296 Fax: 425.955.5300

traded company that operates numerous subsidiary and affiliated companies in the oil and gas drilling industry ("Nabors").

26. The initial yard testing at Nabors produced successful results.

27. Because the yard test results were successful, In May – June 2020 Nabors became interested in purchasing four ICA Units and beta field testing them in an active drilling operation. It also wanted to pursue discussions about purchasing up to 1200 ICA Units if the field testing was also successful, and entering into a strategic alliance to further develop, scale, produce, distribute, and sell ICA Units and further develop the ICA Technology and the related technologies (Nabors Opportunity.")

28. On June 8, 2020, Acamar had HTP sign a loan agreement making HTP financially responsible for Acamar's $131,000 agreement it made with Johnson to fund Johnson and the two technicians' salary and benefit plus up to $200,000 in additional funding that was to be provided at HTP's written request and instructions.

29. In June 2020 Johnson and HTP presented the Nabors Opportunity to HyTech's board of directors. HyTech's HTP-appointed directors wanted to immediately pursue the Nabors Opportunity to avoid the need for additional funding with significant dilution, but HyTech's JCAI-appointed directors were not interested in pursuing the Nabors Opportunity at that time with either HTP or Johnson.

30. During May-June 2020 and thereafter, Johnson and HTP studied how their graphene production technology and ability to make hydrogen on demand could be applied in the oil and gas drilling industry.

31. As a result of their efforts, HTP and Johnson discovered there were several graphene applications that could be used in carbon capture technology, including using a graphene film with holes large enough for carbon dioxide compounds to pass through, but not large enough for other compounds to pass through. This effectively separated

COMPLAINT– 6

environmentally harmful greenhouse gasses from other less harmful gasses that could be released into the environment and not cause a depletion of ozone that is the phenomenon linked to current world climate change.

32. In addition, Johnson and HTP also discovered that with their innovative graphene production method, they could produce graphene from captured carbon dioxide and methane. This was beneficial because captured carbon dioxide or methane would otherwise have to be stored in geological formations deep underground lest the carbon dioxide or methane be released into the atmosphere, thereby causing the damage that carbon capture technology was trying to prevent.

33. While studying the oil and gas industry to attract Nabors to purchase ICA Units, strategically align with HTP, or both, to greatly assist HTP in buying out JCAI's interest in HyTech, Johnson and HTP also discovered several hydrogen applications that would benefit from the ICA Technology, especially the creation of hydrogen and oxygen on demand by using a highly-efficient graphene membrane (as opposed to heavy and expensive metal plates made of plutonium, titanium, or iridium) to separate water into its component elements. These hydrogen applications included, injecting hydrogen into oil and gas wells to desulfurize oil, injecting hydrogen into the diesel refining process to efficiently desulphurize diesel fuel.

34. Finally, HTP and Johnson were expanding energy storage by developing a system or method to created hydrogen-oxygen fuel cells that could provide grid power when power demand was at its greatest. Collectively The ICA Technology and all the applications and technology set forth in this Complaint will be collectively referred to as the "Technologies."

35. Because HTP had hired FMG, Dutton, and Lee to value the Technologies and ICA Units for HTP and to solicit and raise sufficient investment for HTP to buy JCAI's interest in HyTech, HTP disclosed to FMG, Dutton, and Lee the Technologies and the

synergies between their technologies and Nabors' operations, which they would not have learned otherwise (collectively the Information). HTP was also allowed unfettered access to its director Johnson and authorized Johnson to disclose to FMG, Dutton, and Lee the Technologies and the synergies that only HTP, HyTech, and Johnson knew. The information that FMG, Dutton, and Lee learned from HTP and Johnson about ICA Technology, graphene applications in the ICA and other industries, graphene production, graphene applications in carbon capture technology, and hydrogen applications in the oil and gas industry is collectively referred to as the "Information." The Information was HTP's confidential information and FMG, Dutton, and Lee knew the Information was confidential.

36. After receiving the Information from Johnston and HTP, FMG, Dutton, and Lee strategized and advised HTP to leverage the Nabors' Opportunity to promote investments to enable it to raise the JCAI Purchase Price and consummate the JCAI Deal. In or about June 2020 FMG, Dutton, and Lee advised HTP to raise the JCAI Purchase Price through a modestly complex "Three-Part Deal."

    a. PART ONE: HTP was to negotiate the JCAI Deal with JCAI so that HTP could acquire the rights to the Technologies and ownership of the ICA Units.

    b. PART TWO: FMG was to negotiate with Nabors on HTP's behalf and procure an agreement for Nabors to: buy ICA Units, form a strategic alliance to use and exploit the Technologies, or both.

    c. PART THREE: FMG was to solicit and raise the JCAI Purchase Price through a private placement offering for a shell Canadian business entity that FMG owned and referred to as a "special purpose vehicle" ("SPV").

COMPLAINT– 8

37. In or around June 2020 HTP and FMG agreed to FMG's strategy and agreed that FMG would be HTP's agent to negotiate directly with Nabors on HTP's behalf.

38. Finally, in or around June 2020 HTP and FMG agreed that FMG would be compensated for its efforts in determining the market value of the Technologies with the Nabors Opportunity, to be HTP's chief negotiator with Nabors in procuring a purchase order, strategic alliance, or both, and in soliciting and raising investments through a private placement for the SPV in Canada, on a contingency fee basis by them receiving up to 25% of the equity in the SPV if they raised all the necessary capital. FMG's, Dutton's, and Lee's equity would be reduced to the extent that HTP raised investments from its own independent sources.

39. This was generous compensation for FMG's efforts, expenditures, and risk associated with the contingency fee arrangement it struck with HTP. Once the three simultaneous closings contemplated by the Three Part Deal were completed: (1) JCAI would receive the JCAI Purchase Price in cash; (2) HTP would own 75% or more of the SPV; (3) FMG, Dutton, and Lee would own up to 25% of the SPV; and (4) the SPV would have the ICA Technology and ICA Units as well as either or both: a binding purchase order from Nabors to buy ICA units, or a strategic alliance with Nabors.

40. Once the Three Part Deal was consummated, FMG advised HTP that it would then commence an initial public offering through the Canadian Stock Exchange using its sources and contacts that included Cannacord Genuity Group Inc. ("Cannacord"), a financial analyst David Croom, and Sheppard Mullins, a law firm that FMG represented it had hired to document the cross-border transactions and offering contemplated by the Three Part Deal.

41. Due to the synergies between the Technologies and Nabors being well positioned in the oil and gas industry, HTP, Acamar, FMG, Dutton, Lee, and Richardson all agreed that Johnson would continue to develop the Technologies to procure a contract with

COMPLAINT– 9

WESTERN WASHINGTON LAW
GROUP, PLLC
PO BOX 468
SNOHOMISH, WA 98291
425.728.7296 Fax: 425.955.5300

Nabors defining the Nabors Opportunity. Acamar, FMG, Dutton, Lee, and Richardson (collectively the "Funders") agreed to fund Johnson's efforts in developing the Technologies.

42. The Funders funded HTP's and FMG's strategy to continue developing the Technologies and secure the Nabors Opportunity for HTP by directing their collective funding through various affiliated entities and methods, but directing their funding to PNG Equatorial, LLC., a New Mexico limited liability company owned by Johnson ("PNG").

43. Johnson used the funding provided by the Funders through PNG to continue to develop the Technologies and FMG used Johnson's connections with Nabors and the continued development of the Technologies to procure the Nabors Opportunity for HTP.

44. HTP, FMG, Dutton, Lee, Richardson all acted consistent with their agreement. In July 2020 HTP began to negotiate with JCAI to define the JCAI Deal;. In August 2020 HTP and JCAI were in tentative agreement as to the essential terms of the JCAI Deal and the JCAI Purchase Price was approximately $10 Million.

45. The remaining issue to be negotiated between HTP and JCAI was not the JCAI Purchase Price; rather, it was HTP's ability to conduct Nabors testing and the time within which HTP would have to pay JCAI the JCAI Purchase Price. JCAI wanted HTP to pay the JCAI Purchase Price before HTP could further test the ICA Units. HTP explained the Three-Part Deal to JCAI, and JCAI agreed HTP could test the ICA Units provided it signed definitive documents to pay the JCAI Purchase Price within 60 - 90 days. If HTP did not pay the JCAI Purchase Price within that time frame, then it would lose its interest in HyTech and JCAI would own the Technology and the ICA Units.

46. By that time, FMG had already begun negotiating with Nabors to procure the Nabors Opportunity (the "Nabors Deal"). FMG reported to HTP that its negotiations with Nabors had progressed to the point Nabors was willing to purchase additional ICA Units and to fund the field beta testing. FMG also reported that if the ICA Unit testing met or exceeded

an objectively identifiable benchmark of 5% or more increase in fuel efficiency, then Nabors would purchase the 1200 ICA Units, but also that Nabors also wanted a strategic alliance to share in monetizing the Technologies. This was consistent with Nabors environmental policy that included reducing greenhouse gases by increasing fuel efficiencies and capturing carbon dioxide and methane emissions from drilling operations.

47. FMG further reported to HTP that the Nabors testing involved two distinct phases of testing. First, Nabors had to test its existing diesel engine generators without the ICA Units hooked up and running. This is referred to as "baseline testing." After the baseline testing was completed, the same diesel engine generators would be re-tested, but this time the ICA Units would be hooked up and running. This is referred to as "beta testing." Comparing the baseline and beta testing results would determine the increased fuel efficiency caused by the ICA Units. In addition, the baseline and beta field testing would also analyze the respective carbon greenhouse emissions and determine the decrease in carbon-based greenhouse gas emissions caused by the ICA Units.

48. The Nabors Deal's successful testing condition and the JCAI Deal's payment terms were incompatible. Nabors wanted independent engineer verified efficiency testing as a condition to its ICA Unit purchase that would take at least 60 days to obtain under the best of circumstances. JCAI, on the other hand, insisted it receive the JCAI Purchase Price within 60 – 90 days from the date the definitive documents were signed. This incompatibility meant there was insufficient time to complete the logistics of closing all three transactions simultaneously, which was essential. HTP, therefore, tried to buy time with JCAI and push out the JCAI Purchase Price payment date out as far as it could.

49. Meanwhile, FMG, Dutton, Lee, and Richardson came up with a plan to perform the Nabors' baseline field testing of its existing diesel engine generators without the ICA Units hooked up before HTP was required to sign the definitive documents with JCAI for the

COMPLAINT– 11

JCAI deal. This was intended to reduce the time it would take to receive the verified testing results by 6 weeks.

50. HTP agreed to FMG, Dutton, Lee, and Richardson's plan.

51. After the decision to perform Nabors' field baseline testing Johnson then went to Nabors' facilities in Texas and performed the Nabors' baseline field testing.

52. Unbeknownst to HTP, in or around September-October 2020 FMG, Dutton, Nabors and Richardson formed their own agreement to deprive HTP from the Nabors Opportunity and the Nabors Deal and make the deal for their own benefit. Specifically, FMG. Dutton, Lee, and Richardson began negotiating with Nabors regarding the Nabors Opportunity and Nabors Deal by using HTP's and Johnson's confidential contacts with Nabors and the confidential Information they acquired and procured an offer from Nabors for the SPV and Johnson to participate in a strategic alliance with Nabors that was worth at least $75 Million in publicly traded stock from a Nabors affiliate or subsidiary (FMG's Nabors' Deal).

53. Neither FMG, Dutton, Lee, or Richardson ever disclosed to HTP the FMG Nabors Deal.

54. In late September 2020, while Johnson was in Texas performing baseline field testing at Nabors, Acamar informed JCAI that Johnson was at Nabors performing "testing." When making this disclosure, Acamar did not distinguish between baseline testing (without ICA Units hooked up and running) and beta testing (with ICA Units hooked up and running).

55. Acamar's disclosure caused HyTech to send cease and desist letters to Nabors, HTP, and Acamar. FMG knew about this disclosure and HyTech's cease and desist letters. These cease and desist letters caused Nabors to ship to HyTech 5 ICA Units that Nabors possessed at its facilities in Texas.

56. Undaunted by this recent turn of events, FMG, Dutton, Lee, and Richardson persisted in negotiating and procuring the FMG-Nabors Deal for themselves and still not disclosing the FMG-Nabors deal to HTP.

57. On November 23, 2020 FMG changed the SPV's name to NanoGen

58. FMG stopped communicating with HTP on December 4, 2020.

59. Unbeknownst to HTP, in December 2020 NanoGen was operating a graphene production technology and related applications business in Washington and hired a systems engineer and software engineer in Washington.

60. In January 2021 HyTech, Johnson, Acamar, JCAI and HTP tried to resolve their differences through a business solution. The contemplated business solution would allow HTP to use through license the Technologies that were patented and co-own the Technologies that were not patented. HTP would also receive an exclusive right to forge a deal with Nabors.

61. Negotiations between HTP, HyTech, and JCAI progressed through February 2021. During this time, Johnson remained committed to standing in solidarity with HTP to obtain an ownership interest in or the right to use the Technologies, further develop the Technologies, procure sales for the ICA Units, and finalizing the Nabors Deal. During this time, Acamar was also aligned with HTP and was facilitating negotiations with JCAI and HyTech.

62. Prior to March 2021 FMG, Dutton, Lee, and Richardson convinced Johnson to no longer pursue the Nabors Deal with HTP; rather, they convinced Johnson to join them and procure the FMG-Nabors Deal with them instead.

63. On March 5, 2021, Johnson announced he would no longer stand in solidarity with HTP and would no longer continue to work with HTP to acquire ownership and the right to use the Technologies for further exploitation.

COMPLAINT– 13

64. In March-April 2021, Johnson revealed the FMG-Nabors Deal to HTP and offered HTP a 10% interest in the FMG-Nabors Deal in exchange for all HTP's assets, including HTP's soon-to-be-acquired rights to own or use the Technologies.

65. HTP requested the terms of the FMG-Nabors Deal be fully disclosed in writing, including the interest each participant has in the FMG-Nabors Deal and the value of the entire Nabors Deal plus projections as to opportunities for future growth and appreciation.

66. FMG, Dutton, Lee, Richardson, NanoGen, and Nabors refused to disclose the FMG-Nabors Deal to HTP orally or in writing.

67. HTP required shareholder consent to validly sell substantially all its assets and its directors could not support the FMG-Nabors deal without the requested disclosure. As a result, all negotiations between HTP and the consortium of FMG, Dutton, Lee, Richardson, Johnson, NanoGen, and Nabors ceased.

68. On April 6, 2020, after the HTP-FMG negotiations ceased, FMG had hired the Washington law firm that represents Johnson in an employment claim against HyTech and Clark's Estate to send a letter to HTP claiming the money FMG, Lee, Dutton, and Richardson, invested and expended in procuring the FMG-Nabors Deal was an oral loan from FMG to HTP and claiming HTP owed FMG more than $345,000 pursuant to that oral loan.

69. In their latest move, FMG, Dutton, Lee, Richardson, Johnson and Nabors, have caused Acamar to attempt a hostile takeover of HTP that would result in a receiver, who is the former managing principle of the law firm that represents Johnson and FMG, to take control of all HTP's assets, which consist of its minority ownership interest in HyTech and its $741 Million claim against HyTech and JCAI, and now its $75 Million claim against FMG, Dutton, Lee, Richardson, and NanoGen as described in this Complaint.

70. Specifically, on April 30, 2021, Acamar commenced an action to place HTP in a general receivership alleging it is a creditor of HTP under the June 5, 2020, loan agreement.

COMPLAINT– 14

FMG also caused Johnson to support Acamar's receivership petition. The FMG-sponsored takeover attempt does not have majority shareholder approval and HTP's directors oppose the takeover. HTP's largest creditor also opposes the FMG-led take over. That is the reasons FMG had to use a receivership petition rather than corporate governance to achieve its usurpation of the business opportunity that it was hired to procure for HTP but took for itself, Dutton, Lee, and Richardson, using NanoGen as the Canadian corporate enterprise to accomplish its improper motive.

71. In carrying out its scheme to usurp the Nabors Opportunity and other opportunities with other potential customers or allies, to take control of the Technologies, to use the Information and HTP's financial information to HTP's disadvantage, and to cause Johnson and Acamar to cease their otherwise amiable business relationship while HTP, each of the Defendants had a pattern of utilizing interstate and international communications and travel by using cell phones, telephones, the internet, computers, electronic communication. email, internet service provider platforms, and social media.

### IV.   COUNT I – BREACH OF FIDUCIARY DUTY

72. HTP incorporates the allegations of Paragraphs 1-71.

73. HTP and each of the Defendants formed a principal-agency relationship wherein HTP was the principal and each of the Defendants were HTP's agency in procuring a deal with Nabors and otherwise exploiting the Information and the Technologies.

74. HTP reposed its trust and confidence in FMG, Dutton, Lee, Richardson and NanoGen to value the Technologies and negotiate and procure one or more business opportunity(ies) with Nabors (and others) for HTP. HTP turned over control of its confidential Information, its financial information, the Nabors Opportunity, the Technologies and their continued development, its business opportunity and expectancy to acquire the Technologies from JCAI and HyTech. By HTP appointing each of the Defendants to act as

its agents to negotiate with Nabors (and others) and to solicit and procure financial investments in the Technologies, HTP also entrusted each of the Defendants with the power (but not the authority) to alienate HTP's interests in the Information, the Nabors Opportunity, and the Technologies as well as to detrimentally exploit HTP's financial information and position.

75.     Defendants each owed HTP a fiduciary duty of loyalty during the principal-agency relationship, which continues to this day, that includes, but is not limited to, not dealing with HTP as an adverse party in a transaction connected with the agency; not to compete with HTP regarding the subject matter of the agency; to act solely for HTP's benefit in all matters connected with the agency, and deliver to HTP all benefits derived from or inuring to any one or more of the Defendants if any one or more of them breached their fiduciary duty of loyalty.

76.     Each of the Defendants willfully, maliciously, and intentionally breached the fiduciary duties each of them owed to HTP by usurping the Nabors Opportunity (and other opportunities) for their own benefit, convincing Johnson and Acamar to no longer stand in solidarity with HTP and discontinue HTP's legitimate and reasonable business expectation that they would remain part of the HTP team and mutually reap the benefits from further developing the Technologies once HTP acquired them from JCAI and HyTech, alienating HTP's rights to use and own the Information and Technologies, taking control of the Information and Technologies; using NanoGen as the enterprise to carry out the breaches of fiduciary duties they owed HTP, delivering the benefit associated with the Nabors Opportunity (and other opportunities) to HTP, and exploiting the Information and HTP's financial information to its advantage and to HTP's detriment.

77.     Each of the Defendants' breaches of fiduciary duty proximately caused HTP to suffer reasonably foreseeable damages, including compensatory damages by not being able to

COMPLAINT– 16

WESTERN WASHINGTON LAW
GROUP, PLLC
PO BOX 468
SNOHOMISH, WA 98291
425.728.7296 Fax: 425.955.5300

realize the benefits from the Nabors Opportunity (and other opportunities) as well as the expectancy to acquire, develop, and exploit the Technologies and also special damages in legal fees and costs unnecessarily expended in opposing Acamar's receivership proceedings and in curtailing any unauthorized use of disclosure of the Information and Technologies. The loss of the Nabors Opportunity itself was $75 Million.  The resulting damages exceed this amount.

78.    Each of the Defendant's breaches of fiduciary duties has directly and proximately in each of the Defendants receiving ill-gotten gains from their breaches of fiduciary duties that each of the Defendants should be required to account for and disgorge.

## V.    COUNT II (AGAINST ALL DEFENDANTS)

78.    HTP realleges its allegations in Paragraphs 1-71 and 73-76.

79    Each of the Defendants was aware of the Nabors Opportunity and other opportunities, the business relationship between Johnson and HTP, the business relationship between Acamar and HTP, and the impending contract between HTP and JCAI and HyTech. HTP had reasonable and valid business expectancies that arose out of these opportunities and business relationships.

80.    Each of the Defendants intentionally interfered with HTP's valid business expectancies by causing them to be breached or terminated.

81.    Each of the Defendants acted with an improper motive and purpose.  They each acted with an intent to breach their fiduciary duty, and they violated their fiduciary duty each of them owed to HTP as their principal.  They vitiated HTP's trust and engaged in unfair competition and business practices.

82.  As a direct and proximate result of each of the Defendant's actions, HTP has been reasonably and foreseeably damaged in an amount not less than $75 Million.

### VI. COUNT III AIDING AND ABETTING AND CONSPIRACY (AGAINST ALL DEFENDANTS)

83.  HTP realleges the allegations in Paragraphs 1-71; 73-77; and 79-82.

84.  Each of the Defendants agreed amongst themselves to work in concert with one another to accomplish improper common purpose of breaching the fiduciary duty they each owed HTP and in tortiously interfering with HTP's valid business expectancies.

85.  Alternatively, each of the Defendants aided and abetted one another in breaching their fiduciary duty they owned HTP and in tortiously interfering with HTP's valid business expectancies.

86.  As a direct and proximate result of each of the Defendant's actions, HTP has been reasonably and foreseeably damaged in an amount not less than $75 Million

### VII. COUNT IV DECLARATORY RELIEF (AGAINST FMG)

87.  HTP realleges the allegations in paragraphs 1-71

88.  An actual and justiciable controversy and dispute exists between HTP and FMG.

89.  FMG claims monies the Defendants advanced to fund valuing the Technologies, acquiring the Technologies, procuring the Nabors Deal, and further developing and exploiting the Technologies was an approximate $345,000 oral loan.

90.  HTP denies the Defendants, or either of them, including FMG, loaned funds to HTP; rather, HTP asserts any funds Defendants, or either of them spent, or costs they incurred were agreed to be their expenses and investment in earning the contingency fee agreement for the Three Part Deal and receiving up to a 25% equity interest in NanoGen.

COMPLAINT– 18

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

A. Judgment against all Defendants, jointly and severally, for all compensatory damages to be proven at trial, but not less than $75 Million.

B. Temporarily restrain and preliminarily and permanently enjoin each Defendant from using or disclosing the Information or HTP's financial information and usurping or forming any business relationship in the ICA Technology, graphene development, graphene application, carbon capture, electrolysis, making hydrogen and oxygen on demand, hydrogen applications, or reducing greenhouse gas emissions, fields, or industries.

C. Impose a constructive trust on all funds, property, or benefits the Defendants, or any one or more of them, acquired or will acquire from their improper use of HTP's information and from the business opportunity(ies) they usurped.

D. Require each Defendant to account for the funds and benefits they each received from their breach of fiduciary duty.

E. Require each Defendant to deliver to HTP the benefits they each received from their breach of fiduciary duty.

F. Award HTP prejudgment interest against the Defendants.

G. Declare the amounts FMG may have spent and the costs it may have incurred in valuing the Technologies, acquiring the Technologies, developing, and exploiting the Technologies, usurping HTP's business opportunities with Nabors (and others), activating NanoGen, and soliciting investments from investors were not loans to HTP; rather they were each Defendant's investment in earning up to a 25% contingency fee from a successfully consummated and completed Three Party Deal.

H. Award costs to HTP and against the Defendants.

I. Award HTP its reasonable attorneys' fees to the extent allowed by law.

COMPLAINT– 19

J. Such other and further relief as the Court deems just and proper.

DATED this 3rd day of June 2021.

WESTERN WASHINGTON LAW GROUP, PLLC

*/s/ Dennis J. McGlothin*

Dennis J. McGlothin, WSBA #28177
Robert J. Cadranell, WSBA #41773
Attorneys for Plaintiff

COMPLAINT– 20